UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

VIDEO SERVICE OF AMERICA,

       Plaintiff/
       Counterclaim-Defendant,

vs.

                                       Civil Action No. 2:04cv2594

MAXWELL CORPORATION OF
AMERICA, INC.,

                                    Hon. William J. Martini, U.S.D.J.

       Defendant/
       Counterclaimant and
       Third-Party Plaintiff,          **REPORT AND RECOMMENDATION**

vs.

ALAN DAYTON,

       Third-Party Defendant.

APPEARANCES:

Mark T. McMenamy, Esq.
Bressler, Amery & Ross, P.C.
P.O. Box 1980
Morristown, New Jersey 07960

      Counsel for Video Services of America, Inc. and Allen Dayton

Matthew A. Peluso, Esq.
Stryker Tams & Dill, LLP
Two Penn Plaza East, 12th Floor
Newark, New Jersey 07105

      Counsel for Maxwell Corporation of America, Inc.

1

**HEDGES, Magistrate Judge,**

Judge Martini has referred the motion to dismiss filed by Third-Party Defendant Allen Dayton ("Dayton") pursuant to <u>Fed. R. Civ. P.</u> 9(b), 12(b)(2), and 12(b)(6) to me.  The motion seeks dismissal of Third-Party Plaintiff Maxwell Corporation of America, Inc.'s ("MCA") action against Dayton for lack of personal jurisdiction or, in the alternative, for failure to plead fraud with particularity and for failure to state a claim.  I have considered the papers submitted in support of and in opposition to the motion.  There was no oral argument.  <u>See</u> <u>Fed. R. Civ. P.</u> 78.

## BACKGROUND

On March 9, 2004, Video Services of America, Inc. ("VSA") filed a complaint against Maxwell in the United States District Court for the District of Nebraska.  Judge Kopf, on stipulation of the parties, transferred the action to this District pursuant to 28 U.S.C. § 1404(a).  On September 16, 2004, MCA answered the Complaint, counterclaimed against VSA, and filed a Third-Party Complaint against Dayton.

MCA, a New Jersey corporation headquartered in Fairlawn, distributes and sells professional media products through nonexclusive authorized professional media dealers.  (Third-Party Compl., hereinafter "Compl.," ¶¶ 6, 8.)  Dayton is the president and a shareholder of VSA, a professional media dealer.  (Dayton's Decl. ¶ 1.)  Dayton is a citizen of Nebraska.  (Dayton's Decl. ¶ 2.)

In or about 1986, MCA and VSA entered into an agreement whereby VSA became a nonexclusive authorized professional media dealer with license to promote and sell MCA products to specified locations.  (Compl. ¶ 10.)  The parties renewed the relationship as recently as April 1, 2002.  (<u>See</u> Authorized Professional Media Dealer Agreement, hereinafter "Dealer

Agreement.") All of the dealer agreements were personally negotiated by Dayton. (Petruziello's Aff. ¶¶ 1-11.) At all times relevant, Dayton exercised management and control over VSA. (Compl. ¶ 21.)

Since the inception of the relationship, VSA and Dayton represented that VSA was the owner of various branch offices that also sell MCA products on a nonexclusive basis. (Compl. ¶ 15.) VSA consequently collected discounts based on purchases of various media products by these purported branch offices, which MCA treated as those of VSA. (Compl. ¶ 13.) Contrary to the representations of VSA and Dayton, VSA never owned any of these branch offices, which are separate and distinct from VSA. (Compl. ¶ 16.) Instead, MCA alleges that the branch offices are owned and controlled by Dayton personally. (Petruziello's Aff. ¶ 25.)

MCA seeks damages against VSA and Dayton for the granting of excessive discounts, for interference with MCA's financial relationships with other dealers, and for damage to MCA's business reputation under theories of fraud, conversion, Robinson-Patman Act violation, Sherman Act violation, tortious interference with contractual relationship, breach of covenant of good faith and fair dealing, negligent misrepresentation, breach of agreement, New Jersey Consumer Fraud Act ("NJCFA") violations, unjust enrichment, and business slander. (Compl. ¶¶ 20, 22-78. Dayton now moves to dismiss the action for lack of personal jurisdiction or, in the alternative, to dismiss the First, Third, Sixth, Eight, Ninth, and Eleventh Counts of the Third-Party Complaint for failure to plead fraud with particularity and/or for failure to state a claim.

**DISCUSSION**

**I.    Personal Jurisdiction**

Dayton, a non-resident not physically present in New Jersey, moves to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  (Third-Party Def.'s Br. at 3-8.) MCA's claims fall under four classifications of law for purposes of specific jurisdiction analysis: intentional business torts, contract claims, antitrust claims, and negligence.

**A.    Specific Jurisdiction over Intentional Business Torts**

A federal court sitting in New Jersey has personal jurisdiction over a nonresident defendant to the extent authorized under New Jersey's long-arm rule, R. 4:4-4, and consistent with constitutional due process.  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004).  This Circuit has recognized that "New Jersey's long-arm [rule] provides for jurisdiction coextensive with the due process requirements of the United States Constitution."  384 F.3d at 96; see Charles Gendler & Co., Inc. v. Telecom Equip. Corp., 102 N.J. 460, 469 (1986) (holding that out-of-state service is allowed "to the uttermost limits permitted by the United States Constitution" (quotation marks and citation omitted)).  This Court, therefore, need only determine whether the exercise of personal jurisdiction would be permitted under federal due process.  Machulsky v. Hall, 210 F. Supp. 2d 531, 537 (D.N.J. 2002).

"When a defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper."  Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992).  In the absence of an evidentiary hearing, the plaintiff need only present a prima facie case that jurisdiction exists.  Miller Yacht, 384 F.3d at 97.  When making a Rule 12(b)(2)

4

determination, "the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." 384 F.3d at 97.

The plaintiff may meet its burden by establishing "that the particular cause of action sued upon arose from the defendant's activities within the forum state ('specific jurisdiction') or that the defendant has 'continuous and systematic' contacts with the forum state ('general jurisdiction')." Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987); see Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414, n.8-9 (1984) (comparing specific and general jurisdiction).  MCA grounds its argument in specific jurisdiction because the jurisdictional facts fail to demonstrate that Dayton had continuous and systematic contacts with New Jersey.  For a court to properly exercise specific personal jurisdiction within the bounds of due process, the plaintiff must demonstrate (1) that the defendant has "constitutionally sufficient 'minimum contacts' with the forum," and (2) that "subjecting the defendant to the court's jurisdiction comports with 'traditional notions of fair play and substantial justice.'" Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 451 (3d Cir. 2003) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)).

### 1.     Minimum Contacts

The minimum contacts requirement of International Shoe is met where a defendant "'purposefully directs' his activities towards forum residents" or otherwise  "'purposefully avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (citations omitted).  This inquiry is case-specific and turns on the "quality and nature of a defendant's activity in relation to the forum." Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149

F.3d 197, 203 (3d Cir. 1998).  MCA argues that minimum contacts are satisfied because Dayton

allegedly committed tortious acts aimed at and against a resident of New Jersey.  I agree.

In Calder v. Jones, 465 U.S. 783 (1984), the Supreme Court held that a court may

properly exercise jurisdiction over an individual who had no contact with the forum state other

than committing a tortious act when the "brunt of the harm" would be felt there.  465 U.S. at

788-89.  In Imo Indus., Inc. v. Kiekert AG, 155 F.3d 254 (3d Cir. 1998), the Third Circuit

established a framework for applying the Calder "effects test" to business torts.  A plaintiff must

demonstrate the following:

> (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of
> the harm in the forum such that the forum can be said to be the focal point of the
> harm suffered by the plaintiff as a result of the tort; (3) The defendant expressly
> aimed his tortious conduct at the forum such that the forum can be said to be the
> focal point of the tortious activity.

155 F.3d at 265-66.  The court explained that Calder did not carve out an intentional torts

exception to specific jurisdiction that empowers a plaintiff to always sue in his or her home state.

Instead, the Calder effects test recognizes that "the unique relationship among the defendant, the

forum, the intentional tort, and the plaintiff may under certain circumstances render the

defendant's contacts with the forum–which otherwise would not satisfy the requirements of due

process–sufficient."  155 F.3d at 265.

Applying the three-part effects test of Imo Indus., the first prong is satisfied because

MCA sufficiently alleged that Dayton committed the intentional torts of fraudulent

misrepresentation, conversion, interference with prospective economic advantage and contractual

relationships, and consumer fraud.[1]  (Compl., at counts 1, 2, 5, & 9.).

　　As to the second prong, MCA alleges that it "felt" the brunt of the harm in New Jersey.
An individual plaintiff, unlike a corporation, typically suffers harm where the individual is
located.  See Remick v. Manfredy, 238 F.3d 248, 259-60 (3d Cir. 2001) (acknowledging that
individuals endure the bulk of harm from torts in their home states).  A corporation, on the other
hand, "'does not suffer harm in a particular geographic location in the same sense that an
individual does.'"  Imo Indus., 155 F.3d at 255 n.9 (quoting Core-Vent Corp. v. Nobel Indus., 11
F.3d 1482, 1486 (9th Cir. 1993)); but see CDI Int'l, Inc. v. Marck, No. 04-4837, 2005 WL
146890 (E.D.Pa. Jan. 21, 2005) ("[Plaintiff] is a Pennsylvania corporation; therefore it felt the
brunt of [defendant's] torts in Pennsylvania.").[2]  MCA is a New Jersey corporation
headquartered and domiciled in Fair Lawn, New Jersey.  Regarding damages common to all
counts, MCA alleges:

> Through their fradulent scheme and other wrongful conduct, VSA and Dayton
> have wrongfully caused Maxwell to suffer significant financial and other harm,
> including, but not limited to, the granting of excessive discounts to VSA and

---

[1] MCA also alleges business slander in Count Eleven of its Third-Party Complaint  but
has agreed to replead this intentional tort with more specificity.  (Third-Party Pl.'s Br. at 23.)
Therefore, I will not consider business slander in the effects test analysis because this count is
being dismissed without prejudice.

[2] The Imo Indus. court further explained that the location of the harm suffered by a
corporation may depend on whether the damage was to physical property or was more
"incohate," e.g., a decrease in stock value.  155 F.3d at 255 n.9.  The court, however, went no
further in its suggestion that corporations and individuals receive distinct analysis under the brunt
of the harm prong.  It abstained from reconciling this concern with the dicta of a previous
personal jurisdiction decision, Dollar Savings Bank v. First Security Bank of Utah, 746 F.2d 208,
214 (3d Cir. 1984) that stated: "It is questionable judicial policy to apply a different jurisdictional
rule to individuals than to corporations, to small enterprises than to large ones.  To indulge in
such ad hoc determinations creates confusion where there should be certainty . . .."

> Dayton, to which they were not entitled; interference with Maxwell's financial and contractual relationships with other dealers, who have been unable to effectively and fairly compete against VSA, due to the artificially low pricing fraudulently received by VSA; and damage to Maxwell's business reputation and standing in the professional media products industry.

(Compl. ¶ 20.)  On the one hand, Dayton allegedly induced MCA to pay pricing discounts to VSA by its fraudulent misrepresentations.  This financial harm was presumably felt at MCA's headquarters in New Jersey.  On the other hand, Dayton disrupted MCA's business with other dealers who were unable to fairly compete as a result of the discounts.  The location of this harm, as well as damage to MCA's reputation "in the professional media products industry," is more difficult to pinpoint.  MCA has nonetheless reasonably demonstrated that this forum is where it suffered the brunt of its alleged economic loss.

Turning to the third prong, the question is whether MCA has pointed to sufficient acts undertaken by Dayton that demonstrate he "expressly aimed his tortious conduct" at New Jersey such that it is the focal point of the activity.  Imo Indus., 155 F.3d at 266.  The Imo Indus. court focused on "(1) what [the defendant] knew or intended when it undertook its allegedly tortious conduct" and "(2) what steps [the defendant] actually took during the relevant time period."  155 F.3d at 266.  According to MCA, Dayton personally represented to MCA personnel located in Fair Lawn, New Jersey,  through written and telephonic communications, that VSA is the owner of affiliated branch offices that also sell MCA products.  The personal representations regarding ownership were intended to comply with MCA's corporate policy and requirement that pricing discounts based on purchases of MCA products would only be paid if an authorized MCA dealer actually owned and controlled any affiliates.  Furthermore, these representations were allegedly made since the inception of their contractual relationship in 1986 and persisted until 2003.

8

Although he never once entered New Jersey or met with MCA personnel there in furtherance of his activity, Dayton sufficiently targeted this forum as the situs of his tortious conduct.  As all three prongs are met, MCA can rely on the Calder effects test to confer specific jurisdiction so long as it confers with fair play and substantial justice.

### 2.        Fair Play and Substantial Justice

Once minimum contacts are satisfied, jurisdiction conforms with traditional notions of fair play and justice where the defendant "should reasonably anticipate being haled into court there." Toy "R" Us, 318 F.3d at 451 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)); cf. Pennzoil Prods. 149 F.3d at 205 ("[A] court has the option of evaluating whether exercising jurisdiction comports with notions of 'fair play and justice.'" (emphasis added)).  To defeat personal jurisdiction based on fairness where minimum contacts are satisfied, the moving defendant has the burden of proving that "the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477.  A court should consider the defendant's burden, "the plaintiff's interest in obtaining convenient and effective relief," "the forum State's interest in adjudication," "the interstate judicial system's interest in obtaining efficient resolution," and the shared interest of several states in furthering social policy.  471 U.S. at 477 (quoting World-Wide Volkswagen, 444 U.S. at 292).  Cases are "rare . . . in which minimum requirements in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." Asahi Metal Industry Co., Ltd. v. Superior Court, 480 U.S. 102, 116 (1987) (Brennan, J., concurring).  The present action is not one of those rare cases.

Dayton suggests that one of the Burger King fairness factors, the burden on the defendant,

defeats the reasonableness of exercising jurisdiction.  He cites being forced to travel from Nebraska to New Jersey to defend himself as overly burdensome.  (Third-Party Def.'s Br. at 8.) His analogy to the extraordinary circumstances in Asahi Metal, however, is misplaced.  While I appreciate that the distance between Nebraska and New Jersey is material, the burden on Dayton is not analogous to the "severe" burden of a Japanese defendant corporation that is forced to litigate in California in a foreign legal system.  See Asahi Metal, 480 U.S. at 114.  Dayton makes no other arguments concerning exorbitant travel expenses, unavailability of evidence, drains on judicial resources, or countervailing state interests.  Additionally, VSA submitted to personal and subject matter jurisdiction in New Jersey and to this specific Court on all disputes relating to its Dealer Agreement with MCA.  (Compl. ¶ 4; Dealer Agreement ¶ 15.)[3]  As president of VSA and as overseer of the dealer agreements, Dayton will be a central witness in VSA's action against Maxwell and in Maxwell's counterclaim against VSA, subjecting him to travel to this State for purposes of both discovery and trial, irrespective of MCA's Third-Party Complaint against him. I am therefore convinced that exercising personal jurisdiction would not offend the interests of justice.

---

[3] Paragraph 15 of the Dealer Agreement reads in relevant part:

Each of the parties hereto agrees that any legal action or proceeding brought by one or more of them against any other party hereto with respect to the validity or enforcement of this Agreement, any breach or alleged breach hereof, and any such action taken or omitted to be taken hereunder shall be commenced exclusively in the District Court of the United States of America for the Northern District of New Jersey, or, if jurisdiction is not obtainable therein, in the State Court of the State of New Jersey, Bergen County and State of New Jersey, the execution and delivery of this Agreement each of the parties hereto (a) submits to the jurisdiction of each such court in any such actions or proceedings and (b) waives any defense based upon improper venue and lack of jurisdiction.

Coupled with the application of <u>Calder</u> to minimum contacts, personal jurisdiction exists over Dayton as to the allegations of intentional business torts.  Although <u>Calder</u> speaks of intentional torts, there is nothing to suggest from its progeny that it would not apply to the tort of negligent misrepresentation under these facts.[4]  Furthermore, "the interstate judicial system's interest in obtaining efficient resolution," <u>World-Wide Volkswagen</u>, 444 U.S. at 292, weighs in favor of adjudicating MCA's negligence claim along with the others, and not having such a closely related claim litigated elsewhere.  Personal jurisdiction also exists over Dayton for MCA's claim of negligent misrepresentation.

### B.      Specific Jurisdiction over Contract Claims

Although MCA has demonstrated that the <u>Calder</u> effects test applies to its intentional tort claims, it must demonstrate jurisdiction over the remaining claims, namely, breach of agreement, breach of covenant of good faith and fair dealing, and unjust enrichment.  The mere fact that a non-resident defendant has contracted with a resident of the forum state does not in itself justify personal jurisdiction over the nonresident.  <u>Burger King</u>, 471 U.S. at 479; <u>Farino</u>, 960 F.2d at 1223.  A court "must consider the totality of the circumstances, including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing," <u>Remick</u>, 238 F.3d at 256, in order to determine whether the defendant purposefully

---

[4] The Seventh Circuit has held that, after <u>Calder</u>, "there can be no serious doubt . . . that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." <u>Janmark, Inc. v. Reidy</u>, 132 F.3d 1200, 1202 (7th Cir. 1997).   In rejecting this broad, geographically-focused application of <u>Calder</u>, the Third Circuit mentioned in dictum that "<u>Calder</u> . . . was clearly not concerned with negligence."  <u>Imo Indus.</u>, 155 F.3d at 263-64.  I am convinced, however, that exercising jurisdiction over the negligent misrepresentation claim is not contrary to <u>Imo Indus.</u> when considered in light of MCA's numerous allegations of deliberate conduct by Dayton that was aimed at New Jersey.

established minimum contacts with the forum state.  Burger King, 471 U.S. at 478-79; see

Vetrotex CertainTeed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.3d 147, 153 (3d Cir.

1996) (noting that Burger King's reference to "course of dealing" is limited to dealings between

the parties in regard to the disputed contract).  Another Third Circuit decision suggests

consideration of "whether the defendant's contacts with the forum were instrumental in either

formation of the contract or its breach."  General Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d

Cir. 2001).  Courts are generally willing to find personal jurisdiction based on contractual

contacts where defendants "reach out beyond their state and create continuing relationships and

obligations with citizens of another state."  270 F.3d at 150.

        While individuals who act in their corporate capacity are not necessarily shielded from

suit, Calder, 465 U.S. at 790, "jurisdiction over an employee does not automatically follow from

jurisdiction over the corporation which employs him."  Keeton v. Hustler Magazine, Inc., 465

U.S. 770, 781 n.13 (1984); accord Nicholas v. Saul Stone & Co., 224 F.3d 179, 184 (3d Cir.

2000).  In Educational Testing Serv. v. Katzman, 631 F. Supp. 550, 559 (D.N.J. 1986), this Court

refined the Calder and Keeton analyses by distinguishing between actions by a corporate

employee in his official capacity within the forum state, which may be considered for personal

jurisdiction purposes, and actions by the individual in his official capacity outside the forum

state, which are not necessarily sufficient.  But see Moneygram Payment Sys., Inc. v. Consorcio

Oriental, S.A., 65 Fed. Appx. 844, 850-51 (3d Cir. 2003) (holding that actions within the state by

corporate officials in their official capacity did not establish jurisdiction over the officials in their

individual capacity, even if the actions relate to the underlying breach of contract and tort

claims).  Accordingly, a defendant's contacts must be determined individually.  Nicholas, 224

F.3d at 184.

Although VSA has submitted to personal jurisdiction in New Jersey through the Dealer Agreement at issue with MCA, MCA must establish the contractual contacts necessary to extend that jurisdiction to Dayton.  MCA's impermissible endeavor to entangle Dayton in VSA's web of personal jurisdiction by reciting his company's contacts with New Jersey confuses VSA's separate legal identity.  Instead, I focus on Dayton's individual course of dealing with MCA and the alleged breach.  Dayton's contacts in his official capacity are sufficient to satisfy minimum contacts as to MCA's contract claims.

All of Dayton's alleged contractual contacts occurred from outside New Jersey and do not necessarily establish jurisdiction.  In Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 32 (3d Cir. 1993), the Third Circuit held that contractual communications from the nonresident to the forum state by telephone and facsimile did not support exercising personal jurisdiction because "informational communications in furtherance of a contract do not establish the purposeful activity necessary."  The court similarly held  that the communications attending two supply agreements did not support exercising personal jurisdiction in Vetrotex CertainTeed.  75 F.3d at 152.  These and similar cases that denied jurisdiction are distinguishable because the out-of-state communications were merely informational and in furtherance of an existing agreement.  See, e.g., Mellon Bank (East) PSFS, Nat'l Assoc. v. DiVeronica Bros., Inc., 983 F.2d 551, 556 (3d Cir. 1993) (holding that follow-up calls into the forum were insufficient minimum contacts).

MCA, on the other hand, alleges that Dayton's misrepresentations regarding the putative branch offices were fundamental to creating and eventually breaching the Dealer Agreement. MCA submits that the majority of the negotiations between it and VSA were personally

13

communicated by Dayton.  (Petruziello's Aff. ¶¶ 1-11.)  MCA further alleges that Dayton's tortious communications, namely, his fraudulent misrepresentations, were what caused VSA to breach the Dealer Agreement.[5]  (Compl. ¶ 65.)  Dayton should not be surprised to be haled into a New Jersey court if he fraudulently negotiated and maintained various license agreements with a New Jersey company for approximately 15 years, thereby receiving unjust enrichment in the form of discounts paid by MCA.  When an individual defendant uses fraudulent representations to enter into an agreement  to "tap an interstate market" and not merely to transmit a message, he purposefully avails himself of that market's jurisdiction.  Print Data Corp. v. Morse Financial, Inc., No. 01-CV-4430, 2002 WL 1625412, at *4 (D.N.J. 2002); Lebel v. Everglades Marina, Inc., 115 N.J. 317, 327 (1989).

I am satisfied that Dayton's contractual contacts meets the minimum contacts of International Shoe.  Exercising personal jurisdiction over Dayton conforms with traditional notions of fair play and justice.

### C.      Specific Jurisdiction over Antitrust Claims

MCA also bears the burden of demonstrating personal jurisdiction exists over its antitrust

_____

[5] Paragraph 2(i) of the Dealer Agreement provides:

Dealer shall conduct its affairs in an ethical and businesslike manner . . ., report promptly to MCA any information that comes to Dealer's attention which may be helpful to MCA and shall at no time engage in any trade practices with respect to MCA or the Products which in the opinion of MCA may be deemed to be unfair trade practices.

Paragraph 2(k) further provides that "Dealer agrees to provide MCA with an accurate statement of his financial position from time to time as requested by MCA and will advise MCA of any changes in Dealer's financial position . . .."

14

claims.  Section 12 of the Clayton Act provides a special rule for establishing jurisdiction over a corporate defendant's person in any action for antitrust violations.  It authorizes extraterritorial service on a defendant corporation in the district in which it is an "inhabitant" or wherever else it "may be found or transacts business."  15 U.S.C. § 22.  Pursuant to this section, courts have broadly upheld worldwide service of process and, therefore, personal jurisdiction over foreign corporations.  See, e.g., In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d 288, 298 (3d Cir. 2004) (upholding the use of Section 12 to exercise personal jurisdiction over two German corporations, neither of which was an inhabitant, found, or transacting business in the forum district).  If the defendant is an individual, however, then process is served in accordance with the forum state's appropriate long arm statute and within the constitutional limitations of due process.

For the reasons previously discussed under my analysis of specific jurisdiction over the contract claims, this Court may exercise personal jurisdiction over Dayton as to the antitrust claims.  The Third-Party Complaint alleges that Dayton purposefully induced discriminatory pricing in such a way that he impeded MCA's ability to compete in its line of commerce.  (Compl. ¶ 33); see 15 U.S.C. §§ 13(a), 13(f).  By his fraudulent misrepresentations to MCA in New Jersey, Dayton not only tapped an interstate market in such a way that he purposefully availed himself of the privileges of conducting business there, but he acted to lessen MCA's ability to compete with other media dealers.  As  it conforms with fair play and substantial justice, personal jurisdiction is properly exercised over Dayton as to MCA's antitrust claims.

## II.    Pleading Fraud with Particularity

Dayton moves to dismiss Count One for failure to plead fraud with particularity.  (Third-

Party Def.'s Br. at 9.)  While a typical pleading need only "contain . . . a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), Rule 9(b) identifies certain matters, including allegations of fraud, that must be plead with particularity.[6]  A pleading satisfies Rule 9(b) if the complaint describes the circumstances of the alleged fraud with reference to "date, place or time," or uses some means of "'injecting precision and some measure of substantiation into their allegations of fraud.'" Lum v. Bank of America, 361 F.3d 217, 223-24 (3d Cir. 2004) (quoting Seville v. Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation."  361 F.3d at 224.

The heightened requirement "'gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements.'" In re Rockefeller Ctr. Properties, Inc., Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)).  Despite Rule 9(b)'s rigidity, courts should respect the "general simplicity and flexibility" of the Federal Rules.  Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992); see Christidis v. First Penn. Mortgage Trust, 717 F.2d 96, 99 (3d Cir. 1983). Courts should also "be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their fraud" prior to discovery.  In re Rockefeller, 311 F.3d at 216.  The requirements of Rule 9(b) may be relaxed where it can be shown that the defendant retains

---

[6] While the circumstances constituting fraud must be stated with particularity, the defendant's mens rea need only be "averred generally."  Fed. R. Civ. P. 9(b); see generally, Cramer v. Gen. Tel. & Elecs. Corp., 582 F.2d 259, 272-73 (3d Cir. 1978) (distinguishing between the first and second sentences of Fed. R. Civ. P. 9(b)).

exclusive control over the factual information.  311 F.3d at 216.  "[B]oilerplate and conclusory

allegations," however, " will not suffice."  In re Burlington, 114 F.3d at 1418.

The Third-Party Complaint alleges that Dayton committed common law fraud and

NJCFA violations.[7]  The Third Circuit has established five pleading requirements for fraud

claims:

> (1) a specific false representation of material fact; (2) knowledge by the person
> who made it of its falsity; (3) ignorance of its falsity by the person to whom it was
> made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted
> upon it to his damage.

Shapiro, 964 F.2d at 284.  Turning to the first requirement, "unless a materially false or

misleading statement, or omission, is pled . . . none of plaintiff's fraud claims may go forward."

Castlerock Managment, Ltd. v. Ultralife Batteries, Inc., 68 F. Supp. 2d 480, 486 (D.N.J. 1999).

According to MCA, Dayton represented that VSA was the owner of various branch offices

during the negotiation and duration of numerous dealer agreements.  (Compl. ¶¶ 15-16, 69.)

Contrary to his representations, VSA never owned any of the various branch offices.  (Compl. ¶¶

16, 69.)  MCA, therefore, satisfied the first pleading requirement.

As to scienter, the second pleading requirement, "plaintiffs must allege facts that give rise

to an inference that the [defendant] knew or was reckless in not knowing" the falsity of the

statement.  In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996); see In re Burlington,

114 F.3d at 1422 ("Plaintiffs must allege facts that could give rise to a 'strong' inference of

---

[7] In Naporano Iron & Metal Co. v. American Crane Corp., 79 F. Supp. 2d 494, 510
(D.N.J. 2000), this Court held that "the fact that the elements of proof in common law fraud and
NJCFA violations differ does not exempt [plaintiff] from the requirement of particularized
pleading [under Rule 9(b)]."

scienter.").  To do so, "plaintiff must either (1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud."  In re Burlington, 114 F.3d at 1422.  MCA alleges that VSA never owned any of the allegedly affiliated branch offices.  (Compl. ¶¶ 16, 69.)  MCA further alleges in supporting papers that "these alleged 'branch offices' were, and are, owned and/or controlled, in whole or in part, by Dayton personally."  (Petruziello's Aff. ¶ 25.)  Accordingly, MCA has alleged facts that constitute circumstantial evidence of conscious misrepresentation on the part of Dayton in satisfaction of the second requirement.  To be sure, the Third-Party Complaint also sufficiently alleged motive and opportunity to commit fraud: Dayton misrepresented VSA's ownership of the affiliated branch offices to reap the benefit of MCA's corporate policy of granting pricing discounts on products it sold to affiliates, which belong to Dayton, provided the affiliates were owned and controlled by any authorized dealer.  (Compl. ¶¶ 18, 70.); cf. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004) ("Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.").  MCA has shown a strong inference of scienter.

MCA satisfies the three remaining pleading requirements: belief by the plaintiff, intent that it be acted upon, and detrimental reliance.  MCA alleges that it was deceived from 1986, the year it first entered into a dealer agreement with VSA, until 2003, one year after the parties renewed their relationship.  (Compl. ¶ 10-11; Third-Party Pl.'s Br. at 4.)  MCA's assertions of Dayton's fraudulent communications, coupled with his motive to obtain discounts, demonstrate that he intended that MCA grant discounts to the affiliates.  See Lam v. American Express Co.,

18

265 F. Supp. 2d 225.  Finally, MCA alleges that, as a result of Dayton's fraud, it suffered damages by granting undeserved discounts to the purported affiliates.  MCA has, therefore, "inject[ed] precision and some measure of substantiation into [its] allegations of fraud,'" Lum, 361 F.3d at 223-24, and plead fraud with particularity in accordance with Rule 9(b).

## III.  Failure to State a Claim

Dayton moves to dismiss Counts Three, Six, Eight, Nine, and Eleven for failure to state a claim.  (Third-Party Def.'s Br. at 10-14.)  Rule 12(b)(6) allows a party to move for a dismissal based upon the pleader's "failure to state a claim upon which relief can be granted."  District courts generally disfavor Rule 12(b)(6) motions because the long-established policy of the federal rules is to decide cases on the proofs.  Caldwell Trucking PRP Group v. Spaulding Composites Co., Inc., 890 F. Supp. 1247, 1252 (D.N.J. 1995); Panek v. Bogucz, 718 F. Supp. 1228, 1229 (D.N.J. 1989).

"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheur v. Rhodes, 416 U.S. 232, 236 (1974).  "All the rules require is a short and plain statement of the claim that gives the defendant fair notice of the plaintiff's claim and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957); see Fed. R. Civ. P. 8(a)(2).  In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court accepts as true all allegations in the complaint and draws all reasonable inferences from the pleading after construing the complaint in the light most favorable to the plaintiff.  Weston v. Pennsylvania, 251 F.3d 420, 425 (3d Cir. 2001).

Rule 12(b)(6) does not permit "dismissals based on a judge's disbelief of a complaint's

19

factual allegations," <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989), but a court should reject legal conclusions presented in the form of factual allegations.  <u>Bright v. Westmoreland County</u>, 380 F.3d 729, 745 (3d Cir. 2004).  Accepting the facts in the pleadings as true and giving them all reasonable inferences, a court must dismiss under Rule 12(b)(6), "[i]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" <u>Neitzke</u>, 490 U.S. at 327 (<u>quoting</u> <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1957)).

### A.    Price Discrimination

Turning first to Count Three, Dayton does not deny that the Third-Party Complaint alleges actions on the part of VSA that may constitute price discrimination violations.  Dayton argues, however, that the Robinson-Patman Act ("the Act"), 15 U.S.C. § 13, relates to commercial dealings between buyers and sellers, which does not encompass him individually under the current circumstances.  (Third-Party Def.'s Br. at 10.) For this reason he moves to dismiss pursuant to <u>Fed. R. Civ. P.</u> 12(b)(6).  MCA argues that the Act permits an injured party to bring suit against an officer of a corporation, in his individual capacity, for any acts performed on behalf of the corporation in violation of the Act.  (Third-Party Def.'s Br. at 21); <u>see</u> <u>Hoffman Motors Corp. v. Alfa Romeo S.p.A.</u>, 244 F. Supp. 70, 82 (S.D.N.Y. 1965).

Section 2(a) of the Act, provides that a seller may not discriminate in price between purchasers of goods of like grade and quality "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person, who either grants or knowingly receives the benefit of such discrimination, or with customers of them."  15 U.S.C. § 13(a).  Section 2(f)

of the Act, which is directed at buyers as opposed to sellers, prohibits a person engaged in commerce from knowingly inducing or receiving a discrimination in price in a way that violates § 2(a).  15 U.S.C. § 13(f).  The Act's language prohibits the actions of "persons" and applies to individuals as well as corporations.  See 15 U.S.C. § 12 ("The word 'person' or 'persons' whenever used in this Act shall be deemed to include corporations and associations.").  Dayton points to no authority to the contrary.

Accepting MCA's pleadings as true, Dayton personally knew that the discounts to VSA were discriminatory in pricing as to other authorized MCA dealers who were no obtaining such discounts.  (Compl. ¶¶ 15-16, 35-37.)  Furthermore, the Third-Party Complaint alleges that Dayton personally benefitted financially from his scheme as president and shareholder of VSA and the owner of the supposed branch offices.  Dayton does not challenge any other aspect of MCA's antitrust claim.  MCA properly states a claim upon which relief can be granted under the Act.

### B.      Breach of Agreement and of the Covenant of Good Faith and Fair Dealing

Addressing his Rule 12(b)(6) motion to dismiss counts six and eight, Dayton argues that a claim for breach of agreement and for breach of the implied covenant of good faith and fair dealing are contract theories of recovery limited to the actual parties to the agreement.  (Third-Party Def.'s Br. at 11.)  Again, Dayton does not deny that MCA sets out a cause of action for breach against VSA in the Third-Party Complaint.  He argues instead that the pleadings do not allege that Dayton was a party to the Agreement; he argues, therefore, that both counts fail to state a claim upon which relief can be granted.  (Third-Party Def.'s Br. at 11.)  MCA counters that Dayton is personally liable for inducing VSA's breach of its contractual obligations to MCA.

(Third-Party Pl.'s Br. at 23.)

A party pleads a cause of action for breach of contract under New Jersey law[8] if it alleges "(1) a contract,[9] (2) a breach of that contract, (3) damages flowing therefrom, and (4) that the [suing] party performed its own contractual duties." Video Pipeline, Inc. v. Buena Vista Home Entertainment, 210 F. Supp. 2d 552, 561 (D.N.J. 2002).  New Jersey law, however, "provides that 'an officer who causes his corporation to breach a contract for what he conceives to be in the best interest of the corporation does not thereby incur personal liability.'" Fields v. Thompson Printing Co., Inc., 363 F.3d 259, 274 (3d Cir. 2004) (quoting Zieger v. Wilf, 333 N.J. Super. 258, 284 (App. Div. 2000)).  An officer acts in his corporation's best interest if he "acts within the scope of his authority, and with the intent to benefit the principal."  If an officer satisfies these two requirements, then he "'is not liable to a third party for intentional interference with contract even if the [officer] acts with 'mixed motives' to benefit himself or another principal as well.'" 363 F.3d at 274 (quoting Zieger, 333 N.J. Super. at 285 (citation omitted)).

Accordingly, Dayton is personally liable for the breach if MCA alleges that he was not acting within the scope of his authority as president and not acting with the intent to benefit VSA.  MCA made no allegation of either in its pleading.  At best, Dayton is alleged to have acted with mixed motives to benefit VSA and himself by misrepresenting VSA's ownership of the branch offices in breach of the Dealer Agreement.  Liability, however, is attributable to VSA, the

---

[8] Neither party alleges that the law of another jurisdiction applies.  I will therefore apply the law of New Jersey.

[9] "In New Jersey, every contract carries with it the implied covenant of good faith and fair dealing."  Lithium Commerce Corp., Ltd. v. Sara Lee Hosiery, 219 F. Supp. 2d 600, 615 (D.N.J. 2002).

contracting party.  As to Dayton personally, MCA's allegation properly rests on principles of tort, which it alleges in other counts of the Third-Party Complaint.  Under participatory theory in New Jersey, a corporate officer may be held personally liable for torts–intentional torts in particular–committed by the corporation when he is "sufficiently involved in the commission of the tort."  Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303 (2002); see Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 760-63 (1989) (dictum) (leaving unanswered question whether agent of a corporate party to a contract may be charged with tortious interference).  Counts Six and Eight, MCA's claims for breach of agreement and breach of the implied covenant of good faith and fair dealing, should be dismissed for failure to state a claim upon which relief can be granted.

## C.      Consumer Fraud

In Count Nine, MCA alleges that Dayton violated the NJCFA, N.J.S.A. 56:8-1 to -20, which prohibits,

> [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate.

N.J.S.A. 56:8-2 (emphasis added).  Dayton moves to dismiss this count pursuant to Rule 12(b)(6) because NJCFA protects consumers, not sellers such as MCA.  (Third-Party Def.'s Br. at 12.).

The NJCFA protects consumers from harmful practices in the marketing of merchandise and real estate.  Lemelledo v. Benficial Management Corp. of America, 150 N.J. 255, 263 (1997); see Scibek v. Longette, 339 N.J. Super. 72, 77 (App. Div. 2001) ("[NJCRA] was enacted

to protect the consumer against imposition and loss as a result of fraud and fraudulent practices

by persons engaged in the sale of goods and services." (internal quotation marks and citation

omitted)).  Under NJCFA, "[a] consumer is 'one who uses (economic) goods, and so diminishes

or destroys their utilities.'" Windsor Card Shops, Inc. v. Hallmark Cards, Inc., 957 F. Supp. 562,

567 n.6 (D.N.J. 1997) (quoting Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super.

350, 355 (App. Div. 1986)).  I agree with MCA that individuals and corporations alike are

protected by NJCFA.  Hundred E., 212 N.J. Super. at 355.  I have not, however, found any

authority, and MCA provides none, for extending NJCFA's protection to corporations that allege

fraudulent business practices by its consumers.  Count Nine, therefore, should be dismissed for

failure to state a claim upon which relief can be granted.

**D.     Business Slander**

In Count Eleven of the Third-Party Complaint, MCA alleges business slander on the part

of VSA and Dayton that caused it to suffer financial and other harms, including damage to its

business reputation and standing in the industry.  (Compl. ¶¶ 76-78.)  In opposition, Maxwell

agreed to replead Count Eleven with more specificity.  (Third-Party Pl.'s Br. at 23.)

Accordingly, Dayton's motion to dismiss Count Eleven should be granted without prejudice.

**CONCLUSION**

For the reasons set forth above, I recommend that Dayton's motion for dismissal for lack

of personal jurisdiction be DENIED, Dayton's motion for dismissal for failure to plead fraud

with particularity be DENIED, Dayton's motions to dismiss for failure to state a claim as to

Counts Three and Nine be DENIED, Dayton's motion to dismiss for failure to state a claim as to

Counts Six and Eight be GRANTED with prejudice, and Dayton's motion to dismiss for failure to state a claim as to Count Eleven be GRANTED without prejudice.

Pursuant to L. Civ. R. 72.1(c)(2), the parties have ten (10) days from receipt of this Report and Recommendation to file and serve objections.


_____

                                                           s/Ronald J. Hedges
                                                           United States Magistrate Judge

Copy: Judge William J. Martini