UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIDEO SERVICE OF AMERICA, INC., <br><br>    Plaintiff, <br><br> v. <br><br> MAXELL CORP. OF AMERICA, <br><br>    Defendant. | Civ. Action No. 04-2594 (KSH) <br><br> **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

   This matter comes before the Court on defendant's motion for summary judgment (docket entry # 42-1) and plaintiff's cross-motion for relief from a discovery order and for leave to file an amended complaint (docket entry # 43-9). After considering the parties' respective briefs, supplemental submissions, and oral argument, I informed the parties on the record on July 24, 2007 that I would be entering an order **granting** defendant's motion for summary judgment and **denying** plaintiff's cross-motion. This written opinion sets forth the reasons for my ruling.

**I.      Procedural History and Factual Background**

   Plaintiff Video Service of America, Inc. ("VSA") is a professional media dealer engaged in the business of selling media products, including VHS and computer tapes, to end users who require large quantities of these products, such as television networks and government entities. Defendant Maxell Corporation of America ("Maxell") is engaged in the business of manufacturing media products and selling them to professional media dealers, such as VSA.

   VSA commenced this litigation by filing a complaint against Maxell on March 9, 2004 in the United States District Court for the District of Nebraska. The complaint alleges that Maxell violated Section 2(a) of the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13(a), by discriminating

1

in price as between VSA and other professional media dealers who compete with VSA (the "Allegedly Favored Purchasers"). VSA claims that Maxell violated the RPA by giving the Allegedly Favored Purchasers lower invoice prices and higher rebates on its products than it gave to VSA, meaning that VSA paid a substantially higher price for the same products. The complaint also included three counts grounded in Nebraska state law, but VSA agreed to voluntarily dismiss these three claims in August, 2004. The case was transferred to this district by a consent order entered on May 17, 2004.

Maxell has filed a motion for summary judgment on VSA's only remaining claim—the RPA claim.[1] Maxell argues that it is entitled to judgment as a matter of law for three reasons. First, Maxell argues that after all rebates are factored into the calculation, VSA paid a lower net price for its products than any of the Allegedly Favored Purchasers during the relevant time period. Maxell accuses VSA of focusing solely on specific rebate programs and asserts that when all rebate programs are considered, VSA was paying a lower net price than any of the Allegedly Favored Purchasers. Second, Maxell argues that even if it did discriminate against VSA, the RPA claim must fail because VSA has failed to, and cannot, prove that price discrimination caused an anti-competitive injury in the media products industry, as required by RPA. Maxell contends that case law from the Third Circuit and Supreme Court establishes that a plaintiff must offer expert evidence to prove the anti-competitive element of RPA, and that VSA's failure to retain an expert prior to the close of discovery means that it will be unable to prove damages at trial. Finally, Maxell argues that because VSA was not in competition with

---

[1] After VSA agreed to dismiss its three State law claims, Maxell filed an answer denying the RPA claim along with a counterclaim against VSA and a third-party complaint against VSA's owner, Alan Dayton. The counterclaim and third-party complaint include claims for fraud, conversion, tortious interference with prospective economic advantage and contractual relationships, Sherman Act and RPA violations, unjust enrichment, and negligent misrepresentation. Neither the counterclaim nor the third-party complaint are at issue in this motion.

any of the Allegedly Favored Purchasers, any price discrimination as between VSA and the Allegedly Favored Purchasers could not have been an RPA violation.

VSA has filed a cross-motion seeking (1) relief from an order filed February 8, 2006 by Magistrate Judge Hedges that limited the disclosure of certain Maxell invoices to "attorneys' eyes only"; and (2) leave to amend its complaint to add a claim against Maxell for breach of contract. VSA claims that there is sufficient evidence to show that price discrimination caused anti-competitive injury and to prove its damages, but if the Court disagrees, an amended discovery order would allow it to have an expert review the sales data and issue an expert opinion confirming as much. VSA's proposed amended complaint alleges that it is also entitled to damages for breach of contract because its Maxell dealer agreement included an express promise by Maxell to remain "at all times in complete compliance with the [RPA]," and that Maxell breached this agreement by failing to comply with RPA.

## II.     Maxell's Motion for Summary Judgment

### A.     Standard

Federal Rule of Civil Procedure 56(c) authorizes a court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the party seeking summary judgment to prove that there are no genuine disputes of material fact. McCarthy v. Recordex Service, Inc., 80 F.3d 842, 847 (3d Cir. 1996). "Moreover, any inferences to be drawn must be viewed in the light most favorable to the party opposing summary judgment." Id. The Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

### B.     The Robinson-Patman Act

VSA's complaint alleges secondary line price discrimination in violation of § 2(a) of the RPA.[2]  The statute states, in relevant part:

> <u>It shall be unlawful for any person engaged in commerce</u>, in the course of such commerce, either directly or indirectly, <u>to discriminate in price between different purchasers of commodities of like grade and quality</u>, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . , <u>and where the effect of such discrimination may be substantially to lessen competition</u> or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . .

15 U.S.C. § 13(a) (emphases added).  Thus, it is not per se unlawful for a seller to sell a product to different purchasers at different prices.  "Rather, in order to establish a prima facie violation of section 2(a), 'a reasonable possibility of harm, often referred to as competitive injury, must be shown.'"  Steelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1271 (3d Cir. 1995) (quoting J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990)).

To prove a secondary line injury, VSA must prove: (1) the relevant Maxell media product sales were made in interstate commerce; (2) the media products were of "like grade and quality"; (3) Maxell "discriminate[d] in price between" VSA and the Allegedly Favored Purchasers; (4) at the time the price differential was imposed VSA was engaged in actual competition with the Allegedly Favored Purchasers; (5) at the time the price differential was imposed VSA and the

---

[2] "Secondary line cases are characterized by price discrimination by a seller in sales to competing buyers." J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1526 (3d Cir. 1990).  "Primary-line discrimination," on the other hand, is price discrimination that harms direct competitors of the discriminating seller (i.e., predatory pricing to purge competition from the market).  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 220 (1993).

4

Allegedly Favored Purchasers competed at the same functional level ("i.e., all wholesalers or retailers, and within the same geographic market," Steelwagon, 63 F.3d at 1271); and (6) "the effect of such discrimination may be . . . to injure, destroy, or prevent competition" to the advantage of the Allegedly Favored Purchasers, 15 U.S.C. § 13(a); Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 176–77 (2006); Steelwagon, 63 F.3d at 1271. For purposes of this motion, Maxell concedes that VSA has established elements (1) and (2), but argues that VSA has failed to establish any of the other 4 required elements of a secondary line injury.

      i.      **Price Discrimination**

The Supreme Court has defined "price discrimination" within the meaning of RPA as "merely a price difference." Texaco, Inc. v. Hasbrouck, 496 U.S. 543, 559 (1990); Federal Trade Comm'n v. Anheuser-Busch, Inc., 363 U.S. 536, 549 (1960). In determining whether or not there is a price difference, it is necessary to look at the "net" price paid by the purchasers, meaning that the Court must consider all applicable discounts, rebates, offsets, incentives, credits, etc. provided by the seller to the purchasers. Liberty Lincoln-Mercury v. Ford Motor Co., 134 F.3d 557, 571-572 (3d Cir. 1998); A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1407 (7th Cir. 1989) (stating that "[w]hether price discrimination has occurred depends, therefore, on the price after all discounts, specials, and so on"); Conoco, Inc. v. Inman Oil Co., Inc., 774 F.2d 895, 902 (10th Cir. 1985) (declaring that "price under the Robinson-Patman Act is the 'net price' received by the seller").

In this case, VSA claims that a review of Maxell's rebate records shows that Maxell provided its competitors with rebates between 0.5% and 6.5% higher than it provided to VSA

over a period of at least three years.³ (Pl.'s Opp Br. at 10-11.) Maxell counters by arguing that VSA has manipulated the data by focusing only on certain of the rebate programs, rather than on all of the rebates and discounts that it provided to VSA and the Allegedly Favored Purchasers.

In its moving papers, Maxell included spreadsheets showing total rebate calculations for VSA and each of the Allegedly Favored Purchasers. (Def.'s Mov. Br., docket entry # 42, at Exs. D-G.) These spreadsheets show that VSA generally received the highest rebate amounts, but the information also suggests that some of the Allegedly Favored Purchasers did, in fact, receive higher rebate amounts during certain quarters (Q2 2000; Q1 2002; Q2 2002; and Q3 2002). In its reply papers, however, Maxell supplemented this information by including additional rebate programs into the net rebate calculation and demonstrated that VSA received the highest quarterly rebate percentage for every quarter beginning January 1, 2000 and ending December 31, 2005, except for the 3rd quarter of 2002 where Total Media received a 0.5% higher rebate than VSA. (Def.'s Reply Br., docket entry # 52, at Exs. A–G.)

The difference between the parties' calculations appears to be that VSA has only included rebate amounts received under two of Maxell's rebate programs: (1) the Volume Incentive Rebate ("VIR"); and (2) the "Meet Competition" or "Meet Comp" rebate. Maxell claims that VSA's numbers are misleading because VSA also received rebates, which reduced the net price it paid for the products, under several other Maxell programs, specifically: (1) the "metal" rebate; (2) the "growth incentive" rebate; (3) the "dealer direct" discount; and (4) the "FCC" credit program. Maxell argues that when all of the rebates and credits are applied, VSA

---

³ The period of time at issue is disputed by the parties. VSA commenced this litigation by filing a complaint on March 9, 2004 and the statute of limitations for RPA claims is 4 years. 15 U.S.C. § 15b. However, Maxell argues that VSA cannot claim any RPA violations against Maxell for any point after March 31, 2003 because that is the day that the last dealer agreement which VSA had with Maxell expired. VSA argues that the expiration of the contract is irrelevant because the parties continued to do business with one another under the April 1, 2002 dealer agreement until July 21, 2006 when the parties entered into a new dealer agreement. The time period, however, is not dispositive because the Court finds that VSA has failed to establish both price discrimination and competitive injury during any period.

paid the lowest price for its products as compared to the Allegedly Favored Purchasers. Because Maxell included new net price calculations in its reply brief, the Court adjourned oral argument from July 9, 2007 until July 24, 2007, and granted VSA leave to file a supplemental brief addressing the net pricing information presented in Maxell's reply brief.

VSA's supplemental submission, consistent with the arguments presented at oral argument, accepts the net price calculations included in Maxell's reply brief. The supplemental affidavit of Mark McMenamy refers only to invoice price differentials between VSA and Total Media and does not include any discussion of rebates. (Docket entry # 58-1.) The supplemental affidavit of Andrea Greiff addresses rebates, but rather than challenging Maxell's net price-calculation, the affidavit argues that the "dealer direct" and "FCC" rebates included in Maxell's calculation of net price should not be considered by the Court for purposes of ruling on price discrimination because they are purchaser-based rebates, not product rebates. (Docket entry # 58-2.)

VSA's supplemental affidavits make clear that there are no genuine issues of material fact regarding price discrimination. As noted above, in determining whether or not there is price discrimination as defined by RPA, it is necessary to look at the "net" price paid by the purchasers. Liberty Lincoln-Mercury, 134 F.3d at 571-572; A.A. Poultry Farms, 881 F.2d at 1407 (stating that "[w]hether price discrimination has occurred depends, therefore, on the price after all discounts, specials, and so on"); Conoco, 774 F.2d at 902 (declaring that "price under the Robinson-Patman Act is the 'net price' received by the seller"). When all rebates, discounts, offsets, and incentives are considered (regardless of whether they are product-based or purchaser-based), it is undisputed that VSA received the highest quarterly rebate percentage for every quarter from the period beginning January 1, 2000 and ending December 31, 2005, except

7

for the 3rd quarter of 2002 where Total Media received a 0.5% higher rebate than VSA. (Def.'s Reply Br., docket entry # 52, at Exs. A-G.)  Because VSA has not established price discrimination, Maxell is entitled to judgment as a matter of law.

### ii. Competitive Injury

#### a. Were the Allegedly Favored Purchasers Competitors of VSA?

> [A]s a prerequisite to establishing secondary line injury, a plaintiff must "first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential." Moreover, to satisfy this "competitive nexus" requirement, it "must be shown that, as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market."

Steelwagon, 63 F.3d at 1271 (quoting Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 584 (2d Cir. 1987)).

Steelwagon declared in clear terms that the plaintiff has the burden of proving that it was in competition with the Allegedly Favored Purchasers. VSA has failed to do this. In its moving papers, Maxell argued that the Allegedly Favored Purchasers were not competitors of VSA because VSA is a significantly larger company and the Allegedly Favored Purchasers are smaller Maxell dealers operating primarily in regions where VSA either did not operate or had limited operations. VSA failed to counter this argument with record evidence showing that it competed with the Allegedly Favored Purchasers within the same geographic markets. VSA's only statement concerning this point was in a footnote which stated, "It is undisputed that VSA, as a non-exclusive authorized dealer of Maxell's products, competed with other wholesale dealers, such as Total Media, National Video, and FM Valenti, in the same geographic markets." (Pl.'s Opp Br. at 9 n. 3.) VSA's bald assertion that the point is undisputed is insufficient to carry its

8

burden of proving that it was in competition with the Allegedly Favored Purchasers, especially where Maxell had specifically disputed the fact in its moving papers.

Because VSA has failed to provide record evidence establishing that it was in competition with the Allegedly Favored Purchasers, VSA is unable to establish the necessary competitive injury to withstand summary judgment.

      **b.**      **Has VSA Established Competitive Injury?**

Notwithstanding the Court's decision on the issue of whether VSA was in competition with the Allegedly Favored Purchasers, Maxell argues that it is also entitled to summary judgment because VSA's failure to retain an expert to testify on competitive injury will preclude it from establishing damages at trial.

"A hallmark of the requisite competitive injury . . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." Volvo, 546 U.S. at 177. However, the Supreme Court has "also recognized that a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time." Id.

A review of the relevant case law suggests that expert testimony is helpful in establishing a calculation of damages flowing from price discrimination, but is not an absolute prerequisite to proving competitive injury. Maxell cites to three cases in support of its position that expert evidence is needed to establish damages in cases involving violations of RPA: (1) Texaco, 496 U.S. at 572; (2) Steelwagon, 63 F.3d at 1273; and (3) Am. Booksellers Ass'n v. Barnes & Noble, 135 F. Supp. 2d 1031, 1042 (N.D. Cal. 2001).

In Texaco, plaintiffs retained an expert who estimated what their profits would have been if they had paid the same prices as the favored purchasers. 496 U.S. at 552. The jury apparently

9

believed the expert's testimony and awarded actual damages based on the expert's estimate. Id. However, nowhere in the opinion does the Supreme Court indicate that expert testimony is required to establish damages flowing from competitive injury. In fact, the Supreme Court hinted that experts are not required. The Court stated that its decision in J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 565, reaffirmed the "traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury." Texaco, 496 U.S. at 573. The Court continued:

> Damage issues in these cases are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence in decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damages to plaintiffs.

Id.

In Steelwagon, the Third Circuit reversed the district court's judgment insofar as it concluded that the record contained sufficient evidence to support an award of damages for violation of RPA. 63 F.3d at 1276. However, the court did not establish a hard and fast rule requiring expert testimony; the court simply concluded that plaintiff's evidence, which included expert testimony that the court found to be speculative, was insufficient. Id. at 1274–76. Rather than establishing that expert testimony is required in RPA cases, the Steelwagon court reminded the parties that "'the evidence [it] find[s] most persuasive is that of the customers of [the plaintiff], corroborating the sale's personnel's testimony, that the reason [the plaintiff] lost sales was because its prices . . . were not competitive.'" Id. at 1276 n. 18 (quoting J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1537 (3d Cir. 1990)). This indicates that credible testimony from VSA's customers that they chose to purchase media products from the Allegedly

Favored Purchasers instead of VSA because of a lower price, would be sufficient to establish competitive injury without the testimony of an expert.

In American Booksellers, the court expressly held that "only expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct, and not because of lawful competition or other factors." 135 F. Supp. 2d at 1042. However, this Court declines to rely on a single opinion from a district court outside of the Third Circuit in granting summary judgment on this basis.

Despite the fact that expert testimony is not required to establish competitive injury, the Court must still grant summary judgment to Maxell because VSA has failed to produce any evidence showing that the effect of the alleged price discrimination might be to substantially lessen competition. While the Supreme Court has stated that "a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time," Volvo, 546 U.S. at 177 (emphasis added), VSA has failed to provide any evidence, expert or otherwise, to permit the inference that discriminatory pricing resulted in competitive injury. VSA did not provide evidence showing that higher rebates resulted in the Allegedly Favored Purchasers offering the same products to their customers at lower prices than VSA. Without knowing whether or not the Allegedly Favored Purchasers passed any discount on to their customers, a jury would not be able to conclude that the rebates harmed competition. VSA has also failed to provide deposition testimony from customers establishing that they chose to purchase products from other sellers because its prices were not competitive.

VSA has calculated its damages as the alleged difference in price that it was charged compared to what it claims the Allegedly Favored Purchasers were charged. This simple

calculation does not reflect competitive injury—it reflects the difference in price paid by VSA and nothing more. For this reason, the Court must grant summary judgment to Maxell.

### III. VSA's Cross-Motion

VSA has filed a cross-motion seeking (1) relief from a discovery order dated February 8, 2006 which limited the disclosure of Maxell's invoices to Total Media to "attorneys' eyes only"; and (2) leave to file an amended complaint. For the reasons explained below, the cross-motion is denied.

#### A. Relief from the February 8, 2006 Discovery Order

On February 8, 2006, Magistrate Judge Hedges signed a discovery order which stated:

> ORDERED defendant Maxell to produce invoices for Total Media (2000-2004) and plaintiff to produce PO's by March 3, 2006. For attorneys' eyes only. Fact discovery then closed. Judge Martini to schedule premotion conference.

(Docket entry # 38.)

VSA requests relief from this order, claiming that the order barred it from calculating lost sales and/or soliciting the opinion of an expert. VSA believes that there is sufficient record evidence to establish competitive injury, but if the Court finds otherwise, VSA seeks to retain an expert to analyze the data and submit a report to the Court. Maxell argues that the motion should be denied because VSA failed to appeal the ruling within 10 days as required by L. Civ. R. 72.1(c) and because VSA repeatedly represented to both Maxell and the Court that it did not intend to present expert testimony.

> 28 U.S.C. § 636(b)(1)(A) allows a district court judge to
>
> designate a magistrate [judge] to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, . . . to dismiss or permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any

pretrial matter under this subparagraph where it has been shown that the magistrate's order is clearly erroneous or contrary to law.

Similarly, L. Civ. R. 72.1(a)(1), which governs the duties of magistrate judges in civil cases, states that a magistrate judge is authorized to "hear[] and determine[] any pretrial motion or other pretrial matter, other than those motions specified in L. Civ. R. 72.1(a)(2), in accordance with 28 U.S.C. § 636(b)(1)(A) and Fed R. Civ. P. 72."

L. Civ. R. 72.1(c) governs appeals of magistrate judges' orders. That rule permits parties to appeal a magistrate judge's determination of a non-dispositive order within <u>10 days</u> after being served with a copy of the order. Absent good reason, the 10-day time limit is not generally relaxed. Allyn Z. Lite, New Jersey Federal Practice Rules, Comment 3(a) to L. Civ. R. 72.1(c) (Gann) (2007) (citing <u>Jackson v. Chubb Corp.</u>, 2000 U.S. Dist. LEXIS 20348 (D.N.J. Dec. 5, 2000) (Brown), <u>aff'd</u> 2002 U.S. App. LEXIS 11022 (3d Cir. June 5, 2002) (denying plaintiff's appeal of order because it was filed seven days late); <u>Allmond v. Barbo</u>, No. 98-5025 (D.N.J. slip op. May 20, 1999) (Debevoise) (stating that magistrate judge's order "must be affirmed" where the appeal was filed "clearly outside the ten-day time limitation imposed in Fed. R. Civ. P. 72(a) and Local Civil Rule 72.1(c)"); <u>Miller v. Beneficial Mgt. Corp.</u>, 776 F. Supp. 936, 969 (D.N.J. 1991) (Lechner), <u>rev'd on other grds.</u> 977 F.2d 834 (3d Cir. 1992) (five month delay in filing appeal)).

In this case, VSA waited more than <u>ten months</u> before seeking relief from Magistrate Judge Hedge's discovery order and has failed to provide good reason for the delay. For this reason, the motion for relief from the February 8, 2006 discovery order is denied.

  **B.**  **Motion for Leave to File an Amended Complaint**

VSA seeks leave to file an amended complaint to assert a breach of contract claim against Maxell. The dealer agreement executed between VSA and Maxell on June 10, 2002 contained

13

an express statement that Maxell would remain "at all times in complete compliance with the Robinson-Patman Act." VSA claims that it is entitled to damages for breach of contract because Maxell failed to comply with RPA.

Fed. R. Civ. P. 15(a) states that once a responsive pleading has been filed "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The decision to grant or deny leave to amend "is a matter committed to the sound discretion of the district court. Amendment may be denied on the grounds of 'undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party . . . , [or] futility of amendment . . . ." Arab African Int'l Bank v. Epstein, 10 F.3d 168, 174 (3d Cir. 1993) (quoting Forman v. Davis, 371 U.S. 178, 182 (1962)).

VSA did not seek to amend its complaint until after Maxell filed its motion for summary judgment, even though it had more than 3 years to do so. At the time VSA filed its request to amend, fact discovery had been closed for more than 10 months. The contract that the new claim is based on was signed by the parties on June 10, 2002, well before litigation commenced. VSA knew of the contractual provision and could have raised the breach of contract allegations in its original complaint. Moreover, VSA admitted in its answers to interrogatories that Maxell did not breach any contractual obligation. (VSA' Answers to Inter., Nos. 7 and 15, attached as Ex. C to Mov. Br.)

Based on the Court's finding that VSA has not established a prima facie RPA violation, VSA's motion for leave to file an amended complaint is denied. Permitting VSA to amend the complaint at this stage of the litigation would be futile.

**IV.     Conclusion**

       For the foregoing reasons, Maxell's motion for summary judgment is **granted** and VSA's cross-motion is **denied**. An appropriate order will be entered.


Dated: July 26, 2007                                    /s/ Katharine S. Hayden_____

                                                          Katharine S. Hayden, U.S.D.J.